**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| UNITED STATES of AMERICA ex rel. TONI BOGER )<br><br>*Plaintiff-Relator,* )<br><br>vs. )<br><br>SELECT REHABILITATION, LLC; ANU HEALTH SERVICES, LLC; AEGIR HEALTH SERVICES, LLC; BRIGID HEALTH SERVICES, LLC; EPONA HEALTH SERVICES, LLC; KANNON HEALTH SERVICES, LLC; FORTUNA HEALTH SERVICES, LLC; HEARTHSTONE SENIOR COMMUNITIES, INC.; INSTITUTE FOR SENIOR LIVING OF FLORIDA, INC.; ORLANDO REHABILITATION GROUP, INC.; SENIOR HEALTH SOUTH – EX, LLC; SENIOR HEALTH – TNF, LLC; THE NORTHEAST HEALTH GROUP, INC.; THE REHABILITATION GROUP OF PENNSYLVANIA, INC.; SILVER LAKE CENTER, INC.; HOWARD JAFFE; AIRAMID FLORIDA LLC; AND AIRAMID HEALTH SERVICES LLC )<br><br>*Defendants.* | Civil Action No. 2:19-cv-00275-JES-NPM<br><br><br>JURY TRIAL DEMANDED |

_____

**RELATOR'S AMENDED COMPLAINT PURSUANT TO**
**THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730(b)**

Relator Toni Boger ("Relator"), on behalf of herself and the United States of America,

brings this action against Select Rehabilitation, LLC; Anu Health Services, LLC; Aegir Health

Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health

Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC (collectively "Defendants") for violations of the federal False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, and to recover all damages, civil penalties and other recoveries provided for under that statute.

Relator has set forth facts supporting allegations that Defendants have conspired to violate and have in fact violated the False Claims Act at several locations throughout Florida, Massachusetts, and Pennsylvania. Venue is appropriate in the Fort Myers Division of the Middle District of Florida due to the fact that some of the alleged violations of the False Claims Act occurred at two locations in Lee County, Florida and because Defendant Aegir Health Services, LCC operates and manages facilities in Lee County, Florida and Defendant Select Rehabilitation, LLC provides rehab therapy services to those facilities in Lee County, Florida.

## SUMMARY OF THE ACTION

1.    Relator Toni Boger, on behalf of the United States, brings this action to challenge Defendants' ongoing schemes to defraud the United States.

2.    From about March 1, 2019 until mid-April 2019, Relator Boger worked for Defendant Select Rehabilitation, LLC ("Select") as the therapy Program Manager at Regents Park of Jacksonville, a 120-bed skilled nursing facility located at 8700 A C Skinner Parkway, Jacksonville, Florida 32256.  That facility is owned by ISLF Deerwood Place Jacksonville, LLC, which is itself 100% owned by Defendant Institute for Senior Living of Florida, Inc.

3.      Through her employment at this facility, Relator learned that the Defendants in this case—*i.e.* Select and the entities operating a group of 46 related nursing homes in Florida, Massachusetts, and Pennsylvania—have been engaged in three related schemes to defraud the United States.

4.      Two of these facilities are located within Lee County, Florida:  Rehab & Healthcare Center of Cape Coral, in Cape Coral, Florida, and Winkler Court, in Fort Myers, Florida.

5.       All three of these schemes relate to the provision of excessive and unnecessary physical, occupational, and speech-language therapy.

6.      First, Defendants manipulated treatment minutes for Medicare Part A patients to ensure that reimbursement did not drop even after a patient was discharged from one of the three possible therapy disciplines.

7.      Until October 1, 2019, Medicare paid skilled nursing facilities on a per diem basis for all services rendered to a Medicare Part A beneficiary.[1]  One of the most important factors that determined the per diem rate for a patient was the amount of rehabilitative therapy the facility provided to the patient during each assessment period.

8.      Part A beneficiaries could receive treatment in any one or more of the following three disciplines:  physical therapy, occupational therapy, and speech therapy (also commonly referred to as speech language pathology).  It was not unusual for patients to add or drop therapy disciplines—especially speech therapy—during the course of their Part A skilled nursing stay.

9.      In order to inappropriately increase Medicare reimbursement, Defendants tracked when patients were discharged from one therapy discipline and then deliberately manipulated

---

[1]      As of October 1, 2019—after Relator filed her initial *qui tam* complaint, and after she had stopped working for Select—Medicare implemented an entirely different payment system known as the Patient Driven Payment Model, or PDPM.

treatment schedules to make up those lost minutes in the remaining therapy disciplines.  For example, if a patient was discharged from speech therapy, Defendants would add treatment minutes for physical and / or occupational therapy, so that the total number of therapy minutes would stay roughly the same and the per diem rate would not drop.  This was done for purely financial reasons and not due to any legitimate need for additional therapy minutes in those disciplines.

10.     Second, and specific to the Regents of Jacksonville facility where Relator worked, physical therapist Lisa Leech would fabricate treatment sessions in order to prevent drops in reimbursement levels for Part A patients.  Select's Program Manager at the time, Kimberly Duguid, was aware that this fraud was taking place but allowed Defendants to bill for the fraudulently inflated therapy minutes and refused to discipline Therapist Leech.

11.     The United States has not been made whole for the fraudulent claims that resulted from these fabricated treatment sessions, despite the fact that Select has been on notice of these fraudulent claims for years.

12.     Third, and finally, Select's regional manager, Megan Kealy, increased scheduled Part B treatment minutes without consulting with or even notifying the evaluating or treating therapists.  Ms. Kealy had no clinical basis to make these changes.  Instead, she simply sought to increase the amount of reimbursement that Defendants received for their Medicare Part B patients.

## PARTIES

### I.    The Relator

13.     Relator Toni Boger is an adult resident of Jacksonville, Duval County, Florida. Relator Boger is a licensed occupational therapist and, from the beginning of March until mid-

April, 2019, she served as Select's Program Manager at the Regents Park of Jacksonville skilled nursing facility.

14.     Relator has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1). Relator's Complaint is not based on any other prior disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit or investigation, or from the news media.

## II.     The Defendants

### A.     Select Rehabilitation

15.     Defendant Select Rehabilitation, LLC ("Select") is a Delaware limited liability company with a principal address of 2600 Compass Road, Glenview, Illinois 60026.  It is privately owned and managed by partners Neal Deutsch and Anna Gardina-Wolfe.

16.     Select is a contract provider of rehabilitative therapy at more than 650 facilities in more than 30 states, and it employs over 11,000 full-time, part-time, and contract employees.

17.     During the second half of 2016, Select acquired a smaller contract therapy company called Accomplish, which was based in Florida and serviced 73 facilities—mostly in Florida, but also in Delaware, Massachusetts, and Pennsylvania.

18.     Since acquiring Accomplish, one of Select's major business partners has been a group of commonly managed skilled nursing facilities and health service management companies within the States of Florida, Massachusetts, and Pennsylvania.  Each of these facilities and management companies operates as a nominally separate limited liability company (LLC). However, they are all ultimately run and controlled by the same core management group—which

includes Defendant Howard Jaffe, a West Palm Beach, Florida businessman.  For ease of reference, these Defendants shall be identified in this Complaint, collectively, as the "Jaffe Group."

### B.     The "Jaffe Group" Defendants

19.     Defendant Howard Jaffe is a natural person and, upon information and belief, is a resident of Palm Beach County, Florida.  Defendant Jaffe controls more than 40 skilled nursing facilities within the states of Florida, Massachusetts, and Pennsylvania through a series of intermediary organizations.

20.     Defendant Institute for Senior Living of Florida, Inc. is one such intermediary organization within the broader Jaffe Group.  Institute for Senior Living of Florida is a Florida non-profit corporation with its principal address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach, Florida.  The President of the company is Howard Jaffe.  Institute for Senior Living of Florida, Inc. is the 100% owner of several limited liability companies that each own and/or operate a skilled nursing facility within the State of Florida, including the Regents Park of Jacksonville facility where Relator Boger worked, as well as Regents Park of Sunrise, and Regents Park of Winter Park.

21.     Defendant Hearthstone Senior Communities, Inc. is another intermediary organization within the Jaffe Group.  Hearthstone Senior Communities is a Florida non-profit corporation with its principal address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach, Florida, 33401.  The President of the company is Howard Jaffe.  Hearthstone Senior Communities is the 100% owner of several limited liability companies that each own and/or operate a skilled nursing facility within the State of Florida, including: Sweet Bay Health and Rehabilitation Center, Emerald Coast Center, Tarpon Bayou Center, Bartow Center, Groves Center, Lakeland Hills Center, Clearwater Center, and Egret Cove Center.

22.    Defendant Orlando Rehabilitation Group, Inc. is another intermediary organization within the Jaffe Group.  Orlando Rehabilitation Group is a Florida, non-profit corporation with its principal address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach, Florida, 33401.  The President of the company is Howard Jaffe.  Orlando Rehabilitation Group owns and/or operates at least three skilled nursing facilities within the State of Florida: Clermont Health and Rehabilitation Center, Delaney Park Health and Rehabilitation, and Orlando Health and Rehabilitation Center.

23.    Defendant Senior Health South-Ex, LLC is another intermediary organization within the Jaffe Group.  Senior Health South-Ex, LLC is a Florida, limited liability company with its principal address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach, Florida, 33401.  The manager of the company is Howard Jaffe.  Senior Health South-Ex, LLC is the 100% owner of several limited liability companies that in turn each own and/or operate a skilled nursing facility within the State of Florida, including:  Treasure Isle Care Center, Winter Haven Health and Rehabilitation Center, Community Convalescent Center, First Coast Health and Rehabilitation Center, Alpine Health and Rehabilitation Center, Concordia Manor, and South Heritage Health and Rehabilitation Center.

24.    Defendant Senior Health – TNF, LLC, is another intermediary organization within the Jaffe Group.  Senior Health – TNF, LLC is a Florida, limited liability company with its principal address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach, Florida, 33401.  The Manager of the company is Howard Jaffe.  Senior Health – TNF, LLC is the 100% owner of the Whispering Oaks skilled nursing facility in Tampa, Florida.

25.    Defendant The Northeast Health Group, Inc. is another intermediary organization within the Jaffe Group.  The Northeast Health Group is a Massachusetts non-profit company with

its principal place of business located at 200 Kendall Street, Springfield, MA 01104. The President, Treasurer, and Secretary of the company is Howard Jaffe. The Northeast Health Group, Inc. is the 100% owner of four skilled nursing facilities in the State of Massachusetts: Chapin Center, in Springfield, Massachusetts; Governor's Center, in Westfield, Massachusetts; Wilimansett Center East, in Chicopee, Massachusetts; and Wilimansett Center West, in Chicopee, Massachusetts.

26.    Defendant The Rehabilitation Group of Pennsylvania, Inc. is another intermediary organization within the Jaffe Group. The Rehabilitation Group of Pennsylvania, Inc. is a Pennsylvania non-profit corporation with its principal place of business located at Two Bala Plaza, Suite 300, Bala Cynyrd, PA, 19004. The President of the corporation is Howard Jaffe. The Rehabilitation Group of Pennsylvania, Inc. is the 100% owner of two skilled nursing facilities in the State of Pennsylvania: Towne Manor East and Towne Manor West, both in Norristown, PA.

27.    Defendant Silver Lake Center, Inc. is another intermediary organization within the Jaffe Group. Silver Lake Center, Inc. is a Florida non-profit corporation with its principal place of business located at Two Bala Plaza, Suite 300, Bala Cynyrd, PA, 19004. The President of the corporation is Howard Jaffe. Silver Lake Center, Inc. is the 100% owner of one skilled nursing facility in Pennsylvania—Silver Lake Center, in Bristol, Pennsylvania.

28.    In addition to these intermediary organizations, Relator is aware that Defendant Howard Jaffe controls and operates approximately 17 additional facilities that are categorized within Jaffe Group documents as "Florida Institute for Long Term Care" facilities. At one time, the intermediary organization Florida Institute for Long Term Care, LLC appears to have been the 100% owner of the LLCs that owned and/or operated these facilities. However, Florida Institute

of Long Term Care, LLC has not been an active business entity in the State of Florida since approximately October of 2011.

29.    To the best of Relator's knowledge, there is no longer any active intermediary organization for any of these Florida Institute for Long Term Care facilities – just a separate LLC for each facility—each of which lists Howard Jaffe as a manager and each of which lists a principal address of 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach, Florida, 33401.  These facilities are as follows:  Rehab and Healthcare Center of Cape Coral Florida, Casa Mora Rehabilitation and Extended Care, Sarasota Health and Rehabilitation Center, Winkler Court, Carrollwood Care Center, Evergreen Woods, Windsor Woods Rehab and Healthcare Center, Deerfield Beach Health and Rehabilitation, Pompano Health and Rehabilitation Center, Boca Raton Rehabilitation Center, The Rehabilitation Center of the Palm Beaches, Oaks at Avon, Highland Pines Rehabilitation Center, Healthcare and Rehab of Sanford, Rehabilitation and Healthcare of Tampa, Titusville Rehabilitation and Nursing Center, and Abbey Rehabilitation and Nursing Center.

30.    In addition to the intermediary entities named as defendants above, there are also a series of "health services" companies that run the day-to-day business at these skilled nursing facilities and employ the staff who work there—other than the skilled therapy staff that is employed and provided by Select.  Relator is aware of six such companies, each of which is responsible for managing multiple facilities.  For example, Epona Health Services, LLC manages the facility where Relator worked, in addition to five other Jaffe Group skilled nursing facilities.

31.    All six of these health services companies have the same principal place of business, which is also the same principal place of business as several of the intermediary entities

named as defendants above.  Upon information and belief, these health services companies all
share common management and/or ownership with other Jaffe Group Defendants.

32.    Defendant Epona Health Services, LLC is a Florida limited liability company with
its principal business address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach,
Florida, 33401.  Epona Health Services, LLC manages approximately six Jaffe Group facilities in
the State of Florida, including: (1) Healthcare and Rehab of Sanford; (2) Rehabilitation and
Healthcare of Tampa; (3) Titusville Rehabilitation and Nursing Center; (4) Regents Park of Winter
Park; (5) Regents Park of Jacksonville and (6) First Coast Health and Rehabilitation Center.  The
Managing Member of Epona is Airamid Florida LLC.

33.    Defendant Anu Health Services, LLC is a Florida limited liability company with its
principal business address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach,
Florida, 33401.  Anu Health Services, LLC manages approximately nine Jaffe Group facilities in
the State of Florida, including: (1) Deerfield Beach Health and Rehabilitation; (2) Pompano Health
and Rehabilitation Center; (3) Boca Raton Rehabilitation Center; (4) The Rehabilitation Center of
the Palm Beaches; (5) Regents Park of Sunrise; (6) Clermont Health and Rehabilitation Center;
(7) Delaney Park Health and Rehabilitation; (8) Orlando Health and Rehabilitation Center; and (9)
Treasure Isle Care Center.  The Managing Member of Anu is Airamid Florida LLC.

34.    Defendant Aegir Health Services, LLC is a Florida limited liability company with
its principal business address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach,
Florida, 33401.  Aegir Health Services, LLC manages approximately ten Jaffe Group facilities in
the State of Florida, including: (1) Sweet Bay Health and Rehabilitation Center, (2) Emerald Coast
Center, (3) Tarpon Bayou Center; (4) Center of Cape Coral Florida, (5) Casa Mora Rehabilitation
and Extended Care, (6) Sarasota Health and Rehabilitation Center, (7) Winkler Court, (8)

Carrollwood Care Center, (9) Evergreen Woods, and (10) Windsor Woods Rehab and Healthcare Center. The Managing Member of Aegir is Airamid Florida LLC.

35.     Defendant Brigid Health Services, LLC is a Florida limited liability company with its principal business address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach, Florida, 33401.  Brigid Health Services, LLC manages approximately eight Jaffe Group facilities in the State of Florida, including: (1) Bartow Center, (2) Groves Center, (3) Lakeland Hills Center, (4) Whispering Oaks, (5) Winter Haven Health and Rehabilitation Center, (6) Community Convalescent Center, (7) Oaks at Avon, and (8) Highland Pines Rehabilitation Center.  The Managing Member of Brigid is Airamid Health Consulting LLC.

36.     Defendant Kannon Health Services, LLC is a Florida limited liability company with its principal business address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach, Florida, 33401.  Kannon Health Services, LLC manages approximately six Jaffe Group facilities in the State of Florida, including: (1) Abbey Rehabilitation and Nursing Center; (2) Alpine Health and Rehabilitation Center, (3) Concordia Manor, (4) South Heritage Health and Rehabilitation Center, (5) Clearwater Center, and (6) Egret Cove Center.  The Managing Member of Kannon is Airamid Florida LLC.

37.     Defendant Fortuna Health Services, LLC is a Delaware limited liability company with its principal business address at 1665 Palm Beach Lakes Boulevard, Suite 600, West Palm Beach, Florida, 33401.  Fortuna Health Services, LLC manages the day-to-day operations of Jaffe Group facilities located within the states of Pennsylvania and Massachusetts.

38.     Defendant Airamid Florida LLC is a Delaware limited liability company with its principal business address at 1665 Palm Beach Lakes Boulevard, Suite 400, West Palm Beach,

Florida, 33401. Airamid Florida is listed in Florida Secretary of State records as the "Managing Member" for Defendants Anu, Aegir, Epona, and Kannon.

39.    Airamid Health Services, LLC is a Delaware limited liability company with its principal business address at 1665 Palm Beach Lakes Boulevard, Suite 400, West Palm Beach, Florida, 33401. It is the ultimate parent company of the defendant "health services" companies identified above that managed day to day operations at the Jaffe Group facilities.

### C.    **The United States**

40.    The United States is a party to this action, and Relator brings this action on behalf of the United States of America (hereafter "United States") as well as on her own behalf. The United States is a plaintiff on behalf of the U.S. Department of Health & Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), and other federally funded health care programs, including Medicare, Medicaid, and Tricare.

### JURISIDICTION AND VENUE

41.    Jurisdiction is founded upon the FCA, 31 U.S.C. §3729, *et seq.*, specifically 31 U.S.C. §3732(a) and (b), and also upon 28 U.S.C. §§ 1331 and 1345.

42.    Venue in the Middle District of Florida is appropriate under 31 U.S.C. §3732(a) in that, at all times material to this civil action, Select Rehabilitation and the Jaffe Group Defendants transacted business in the Middle District of Florida or submitted or caused the submission of false claims in the Middle District of Florida.

43.    More specifically, venue is appropriate in the Fort Myers Division of the Middle District of Florida. Two of the Jaffe Group Defendant facilities—Rehab & Healthcare Center of Cape Coral, in Cape Coral, Florida, and Winkler Court, in Fort Myers, Florida—are located in Lee County, within the Fort Myers Division. Defendant Select Rehabilitation provides the skilled

rehabilitative therapy at these facilities, and Defendant Aegir Health Services, as part of the broader Jaffe Group, manages the day-to-day facility-side operations.

44.     Relator provided the United States with a full written disclosure of substantially all material facts, as required by the FCA, 31 U.S.C. § 3730(b)(2).

## GOVERNING LAW

### I.     The Federal False Claims Act

45.     The FCA provides, in part, that any entity that (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for damages and penalties.  31 U.S.C. §3729(a)(1)(A)-(B).  Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.  31 U.S.C. §3729(a)(1)(G).

46.     A person acts "knowingly" under the FCA when he or she "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. §3729(b)(1)(A).  No proof of specific intent to defraud is required by the FCA.  31 U.S.C. §3729(b)(1)(B).

47.     Under the FCA, an "obligation" is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. §3729(b)(3).

48.     FCA violations may result in civil penalties of between $5,500 and $11,000 per false claim, subject to any adjustment in the range of appropriate penalties mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, plus three times the amount of damages sustained by the Government as a result of the illegal conduct.  31 U.S.C. §3729(a).

## II.     Medicare Payments for Skilled Therapy within Skilled Nursing Facilities prior to October 1, 2019

### A.     Under Medicare Part A

49.     Part A of the Medicare Program provides benefits to participants that cover, among other services, skilled nursing and rehabilitative therapy provided in long-term-care ("LTC") nursing facilities for the first 100 days of the beneficiary's stay, after a qualifying in-patient hospital stay.

50.     During this 100-day period, and up until the change in billing rules on October 1, 2019, Medicare Part A made prospective per diem payments to the skilled nursing facility that represented payment in full for all services rendered to that beneficiary within the relevant time period. 42 C.F.R. § 413.335(b).

51.     The amount of the prospective per diem payment for a particular patient was calculated through a formula that factored in the needs of the patient and the level and amount of care provided by the facility.  42 C.F.R. § 413.337(c).

52.     The per diem payments were not designed to compensate skilled nursing facilities for their exact costs per patient, but they were designed to compensate at generally higher rates for patients that required higher levels of therapy and nursing care.

53.     Under this system, skilled nursing facilities had to conduct periodic patient assessments to record any changes in patient status or the nature or amount of services being

provided. 42 C.F.R. § 413.343. The data collected in these assessments was captured and submitted in a form known as the Minimum Data Set ("MDS"), and data in the MDS served as the basis for establishing prospective per diem payments for that patient in that period.

54.     Each MDS was designed to capture patient data based on a seven-day look back. In other words, starting on the date of the assessment (*i.e.* the assessment reference date or "ARD"), the MDS was used to record the patient's health and the services provided by the facility during the past seven days. This data would then be used as the basis of prospective per diem payments to the facility during the covered payment period.

55.     If a Part A patient stayed at the facility for the full 100-days, without interruption, then the facility generally had to perform at least five total assessments for that patient: the 5-day assessment (which could actually take place up until the patient's 8th day at the facility); the 14-day assessment; the 30-day assessment; the 60-day assessment; and the 90-day assessment.

56.     For each of these assessment periods, a Part A patient in a skilled nursing facility would be assigned a three-letter Resource Utilization Group ("RUG") code that roughly reflected the level and amount of service being provided during that assessment period. *See* CMS, MEDICARE CLAIMS PROCESSING MANUAL ("Claims Processing Manual"), Ch. 6 – SNF Inpatient Part A Billing and SNF Consolidated Billing, § 30.4.2 (as in effect until October 1, 2019). The specific RUG code assigned to a patient determines the rate of the prospective per diem payment for the covered pay period.

57.     The RUG code, in turn, would be determined from three basic components: (1) a nursing component; (2) a therapy component; and (3) a non-case-mix adjusted component. CLAIMS PROCESSING MANUAL, Ch. 6, § 30.4.2 (as in effect until October 1, 2019) .

58.     Part A patients who received any amount of rehabilitative therapy during the seven-day assessment period (*i.e.* the seven-day look-back period starting from the assessment reference date) had the letter "R" as the first letter in their RUG code.  *See* CMS's RAI Version 3.0 Manual, Ch. 6 – Medicare SNF PPS at 21-26.

59.     The second letter of the RUG code would then be based on the total amount of rehabilitative therapy provided to that patient during the seven-day assessment period.  There were five possible letters, corresponding to five different levels of therapy:

U = Ultra High          (720 total minutes or more in the past 7 days)
V = Very High           (500 total minutes or more in the past 7 days)
H = High                (325 minutes or more in the past 7 days)
M = Medium              (150 minutes more in past 7 days)
L = Low                 (at least 45 minutes in past 7 days)

60.     The final letter of the RUG score was based on "activities of daily living," such as the patient's ability to eat, toilet, and transfer in and out of bed with or without assistance.

61.     Under this model, patients who received 720 minutes or more of therapy during the seven-day reference period were categorized as Ultra High or "RU" level and CMS paid higher per diem rates for those patients than it did for patients categorized as RV, RH, RM, or RL.

**B.    Payments Under Medicare Part B**

62.     Medicare Part B is a voluntary insurance program providing supplemental medical insurance benefits to aged and disabled enrollees.  42 U.S.C. §1395j.

63.     For covered beneficiaries in LTC nursing facilities, Medicare Part B will cover certain forms of reasonable and necessary patient therapy after the beneficiary has exhausted Part A coverage for those services.

64.     Specifically, Part B will cover outpatient physical therapy services, outpatient occupational therapy services, and outpatient speech-language pathology services.  42 U.S.C. §1395k(a)(2)(C); *see also* MEDICARE CLAIMS PROCESSING MANUAL, Ch. 7, §10.1.

65.     Medicare will typically pay for 80% of the cost of these therapy services, with the beneficiary responsible for the remaining 20%.  *See* 42 U.S.C. §§1395l(a)(8), 1395m(k).

66.     Unlike the PPS system under Medicare Part A, outpatient skilled therapy services paid for under Medicare Part B are reimbursed based on time-based units, with every 15 minutes of therapy generally constituting one billable unit.  *See* MEDICARE CLAIMS PROCESSING MANUAL, Ch. 5, § 20.2.  Also unlike Medicare Part A, there has not been any meaningful change to this reimbursement model during the relevant time period.

67.     Medicare Part B will not pay for any expense that is "not reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. §1395y(a)(1)(A).

## **BACKGROUND FACTS**

68.     On or about March 1, 2019, Relator Boger began working for Select as the Program Manager at Regents Park of Jacksonville, a 120-bed skilled nursing facility located at 8700 A C Skinner Parkway, Jacksonville, Florida 32256.

69.     Select had been the contract therapy provider at this facility—and at other Jaffe Group facilities—since sometime in the fall of 2016, at the point when Select acquired Accomplish, which had previously held the contract.  Relator's understanding is that Accomplish had previously been the therapy services provider at the Jaffe Group facilities prior to being purchased by Select.

70.     Prior to Relator Boger, Select's Program Manager at Regents Park of Jacksonville was a physical therapy assistant named Kimberly Vance Duguid.

71.     As Program Manager, Relator Boger was responsible for managing all of the therapists who worked in her facility and also managing and reviewing the therapy caseload.  She reported to a Select Regional Manager, Megan Kealy, who had responsibility for at least five other Jaffe Group facilities:  (1) Healthcare and Rehab of Sanford; (2) Rehabilitation and Healthcare of Tampa; (3) Titusville Rehabilitation and Nursing Center; (4) Regents Park of Winter Park; and (5) First Coast Health and Rehabilitation Center.  This region was generally referred to as the "Epona" region, as the Jaffe Group entity that ran the day-to-day business at these facilities was Epona Health Services, LLC.  Regional Manager Kealy, in turn, reported to a Regional Vice President, named Kelli Davis.

72.     As Program Manager, Relator also had to interact regularly with the Facility Administrator for Regents Park of Jacksonville, a woman named Jessa Collins.

73.     Under the skilled nursing contract between Select and Regents Park of Jacksonville, it is the owner/operator of the facility that submits claims for payment to the United States for skilled therapy services—at least for Part A beneficiaries.  However, Select and its therapists actually provide the therapy treatment and document the amount of therapy being provided to each patient.

74.     For patients covered by Medicare Part A, the amount of skilled therapy was input into the patient's MDS form and became one of the most important data points in determining per diem reimbursement rates by the United States.

75.     In March of 2019, the United States reimbursed Regents Park of Jacksonville $576.61 for every day that a Part A patient was at an RUG level of "RUB".  The "U" in RUB

stands for Ultra High, and corresponds to 720 or more total minutes of therapy during the relevant
assessment period.

76.     In contrast, Regents Park of Jacksonville was reimbursed $428.37 for every day
that a patient was classified as an "RVB," a RUG level that corresponds to 500 to 719 minutes of
therapy during the relevant assessment period.

77.     As a result of this reimbursement model, a one-minute difference in the therapy
provided during an assessment period—719 versus 720 minutes—could result in a $148.24 ***per
day*** difference in reimbursement to Defendants for a particular Part A patient.

78.     For Medicare Part B patients, skilled therapy is billed to the United States based on
units of therapy.  For most therapy services, units are time-based and each unit equals 15 minutes
of therapy services provided.

79.     Under the therapy services agreement between Select and Regents Park of
Jacksonville, Relator's understanding is that the facility keeps most of the Part A reimbursement
for itself, while Select keeps most of the Part B revenue.

80.     Under this financial arrangement, Select's therapists and program manager were
under constant pressure to keep ***both*** the Part A and Part B therapy numbers high—in order to keep
management at both Select and the Jaffe Group entities happy.

81.     During Relator's brief tenure as Program Manager at her facility, she did her best
to ensure that patient care was not being driven by profits and that patients actually received
therapy that was appropriate to their medical needs.  However, it quickly became clear that neither
her own managers at Select nor the Jaffe Group facility managers had any interest in the wellbeing
of those patients.  Instead, they were simply concerned with hitting revenue targets and keeping
their numbers up.

82.    As Relator spoke to therapists in her building and researched patient treatment and billing records, it became clear that this profit-over-patients model had been in place for a long time—at least as long as Select had been providing rehabilitative therapy for the building, and likely much longer—and was not limited to her particular facility.

83.    After about six weeks of constant pressure and criticism for her facility's "declining" numbers—which were still well above what Relator considered to be normal Part A and Part B billing numbers—Relator determined that unless she wanted to become ethically or legally compromised herself, she had no choice but to resign from her position as Program Manager for the facility, which she did in mid-April 2019.

## DEFENDANTS' SCHEMES TO DEFRAUD THE UNITED STATES

84.    As noted above, Select and the Jaffe Group Defendants have engaged in three schemes to defraud the United States.

85.    First, Defendants have implemented a policy of tracking when a patient is discharged from one of the three therapy disciplines, so that Defendants can increase treatment minutes in the other therapy disciplines.  This discharge-tracking and minute shifting is not done for any legitimate medical reason.  Instead, the entire purpose of this scheme is to ensure that patients stay at a high RUG level—most often an Ultra High / RU – even after being discharged from a therapy discipline.

86.    Second, Defendants billed at inflated RUG rates for patients at Regents Park of Jacksonville based on the falsified treatment records of therapist Lisa Leech.  When a patient was on track to miss a scheduled RUG target (e.g. 720 minutes)—because of a missed therapy visit, the patient being sick, etc . . .—therapist Leech would often go back and change her chart notes to add just enough additional minutes to bump that patient back up to the scheduled RUG.  However,

these were not therapy minutes that therapist Leech actually performed.  Select became aware of this fraud and ultimately terminated Ms. Leech's employment.  But the fraudulent overpayments were not refunded to the government.

87.    Third, with respect to Part B therapy patients, Select regional manager Megan Kealy had a practice of logging into the electronic records systems to increase the amount of therapy minutes Part B patients were scheduled to receive, even though Ms. Kealy had never evaluated the patients and was totally unqualified to set therapy schedules for those patients.

**I.    Defendants Knowingly Provide Excessive Amounts of Part A Therapy For No Other Reason Than To Bill For It.**

**A.    General Description and Background of the Scheme.**

88.    During the period that Select has served as therapy contractor to the Jaffe Group facilities, the overriding rule has been to maximize Ultra High-level RUG payments.

89.    This rule has worked in two basic ways.  First, Select regional managers and facility-side managers from the Jaffe Group entities pressure Select Program Managers to set therapy schedules in a way that maximizes reimbursement.  For the majority of Part A patients, this means that the Program Manager is pressured to schedule the patient for 720 minutes or more of therapy during each assessment period.  The treating therapists, in turn, are expected to follow this schedule, regardless of whether the scheduled minutes are medically appropriate for that particular patient.

90.    Second, Defendants pressure Program Managers and therapists to avoid scheduling or providing more therapy than necessary to hit the Ultra High RUG level, in order to maximize Part A reimbursement and minimize treatment costs.  Because of the way RUG levels functioned within Medicare's PPS reimbursement system, there was no financial benefit in overshooting the number of therapy minutes required to reach a RUG level.

91.    For example, if it became clear during an assessment period that a particular patient was going to get enough therapy minutes to hit a "very high" or RV level, which requires 500 - 719 minutes, but not enough for an "Ultra High" RU level, which requires 720 minutes, then it became financially advantageous to cut back on therapy minutes to ensure that the patient stayed as close to the 500-minute threshold as possible.

92.    Both Select's regional managers and their counterparts within the Jaffe Group have kept a close watch over patient therapy projections and made sure that Select's therapists maximized reimbursement and minimized unprofitable therapy minutes, without any regard for what was in the best interests of the patients.

93.    As a result, many patients at these facilities received far more therapy than their medical conditions warranted, simply to ensure that Defendants maximized their own reimbursement.    At other times, patients have received less therapy than their conditions warranted, based on Defendants deciding that providing more therapy minutes to that patient during the assessment period was no longer in their financial interests.

94.    During the period Relator worked as Program Manager at Regents Park of Jacksonville, her Select managers and the facility-side Jaffe Group managers all pressured her to keep her RU numbers up.

95.     From the moment Relator started, her Regional Manager, Megan Kealy, told her that the RU numbers for her facility were too low, and that the facility management was not happy. Relator was taken aback by these statements, as it was inappropriate to even talk about RU levels being "too low" at a facility without understanding the patient population and their particular needs.

96.     Regional Manager Kealy, however, made clear that she was not interested in patient needs, and was simply interested in maximizing therapy reimbursements for Select and its Jaffe Group clients.

97.     Jessa Collins, the facility administrator for Regents Park of Jacksonville, was even more blunt on this point.  During meetings that both Relator and Ms. Collins attended, Ms. Collins repeatedly stated that therapists working at the facility needed to look out for "the best interests of the facility" in providing therapy, even if that meant that the best interests of the **patient** took a back seat.

98.     Ms. Collins also emailed Regional Manager Kealy on at least one occasion—on April 1, 2019—to ask whether there is "any movement on potentially trying to get ou[r] part A rate up? It is unbelievably low!!" Regional Manager Kealy then forwarded this email to Relator.

99.     Despite the pressure from both the facility administrator and her own regional manager, Relator refused to compromise her professional ethics for the sake of better numbers. She made it a point to consult with her evaluating therapists in setting the therapy minutes for her Part A patients, and she did not just set Part A patients to an Ultra High RUG level as a matter of course.  This practice greatly irritated Facility Administrator Collins and Regional Manager Kealy.

100.     On April 3, 2019, Ms. Collins forwarded Relator a chart titled "Clinical Reimbursement Weekly Update," comparing the RU statistics across the 46 different Jaffe Group facilities for the month of March 2019.  Regents Park of Jacksonville had a 76.66% RU rate—meaning that 76.66% of all Medicare Part A therapy days that month were at the RU level.

101.     While 76.66% significantly exceeded national averages according to CMS data, it still placed Regents Park of Jacksonville as one of the lower scoring Jaffe Group facilities for the month.   Many of the other facilities on the Jessa Collins chart had RU percentages in the 80s or

90s.  One facility, Alpine Health and Rehabilitation Center, in St. Petersburg, Florida, had a

monthly RU rate of 100%.

102.    In forwarding this chart, Administrator Collins also included a message to Relator,

stating, "This is what I am referring to.  We are at 76% for Us.  I need you and Megan [Kealy] to

focus on trying to bring this number up, any little movement will help – does not have to be huge."

103.    This exchange removed any doubt from Relator's mind that Select and the Jaffe

Group administrators were just interested in increasing revenue, regardless of what that meant for

patient well-being.

104.    Based on her years of experience as a therapy administrator, Relator knew that a

normal "Ultra High" percentage for a skilled nursing facility is usually somewhere in the sixties

or low seventies.

105.    It was therefore disconcerting to see just how many Jaffe Group facilities on the

Clinical Reimbursement Weekly Update chart had percentages in the eighties and nineties.

106.    Of the 45 Jaffe Group facilities that treated any Part A rehab patients in March of

2019 (one, Sweet Bay Health and Rehabilitation Center, did not), 77.7% of them had an RU

percentage above 80.  A total of 21 facilities had an RU percentage between 80 and 90, and 14

facilities had an RU percentage between 90 and 100.

107.    From Relator's experience, having so many different, commonly-managed

facilities at such high rates did not seem like something that should be possible if therapy was

being scheduled and provided based on actual patient need.

108.    The March 2019 RU percentage for each of the Jaffe Group facilities was as

follows:

| Facility | Percentage of Part A therapy days that qualified as Ultra High (RU) days in March of 2019 |
|---|---|
| Cape Coral | 96.87 |
| Casa Mora | 84.71 |
| Sarasota | 90.16 |
| Winkler Court | 93.32 |
| Carrollwood | 96.98 |
| Evergreen Woods | 90.62 |
| Windsor Woods | 82.65 |
| Sweet Bay | 0 |
| Emerald Coast | 91.90 |
| Tarpon Bayou | 76.32 |
| Deerfield | 86.45 |
| Pompano | 74.11 |
| Boca Raton | 88.50 |
| Palm Beaches | 89.77 |
| Regents Park Sunrise | 89.11 |
| Clermont | 84.70 |
| Delaney Park | 83.77 |
| Orlando | 71.25 |
| Treasure Island | 84.11 |
| Oaks at Avon | 92.32 |
| Highland Pines | 73.43 |
| Bartow | 84.98 |
| Groves | 89.86 |
| Lakeland Hills | 80.51 |
| Winter Haven | 62.03 |
| Community | 90.48 |
| Whispering Oaks | 82.12 |
| Sanford | 94.94 |
| Tampa | 93.09 |
| Titusville | 84.95 |
| Regents Park of Jacksonville | 76.66 |
| Regents Park of Winter Park | 94.41 |
| First Coast | 92.95 |
| Chapin | 63.64 |
| Governor's | 70.91 |
| Willimansett East | 85.38 |
| Willimansett West | 85.63 |
| Towne Manor East | 47.89 |
| Town Manor West | 95.70 |
| Silver Lake | 85.86 |
| Abbey | 81.72 |

| | |
|---|---|
| Clearwater | 79.75 |
| Egret Cove | 83.75 |
| Alpine | 100.00 |
| Concordia | 87.27 |
| South Heritage | 88.80 |

109.    The numbers were similarly high when Relator looked at the historical records for her own Regents Park of Jacksonville facility.  At that facility, the percentage of all Part A therapy days each month that qualified for reimbursement at an Ultra High, RU level, was as follows for 2017 and 2018:

| Month | Percentage of Part A therapy days that qualified as Ultra High (RU) days |
|---|---|
| January 2017 | 82.49 |
| February 2017 | 77.38 |
| March 2017 | 79.44 |
| April 2017 | 78.85 |
| May 2017 | 83.59 |
| June 2017 | 83.48 |
| July 2017 | 93.89 |
| August 2017 | 86.58 |
| September 2017 | 86.62 |
| October 2017 | 74.37 |
| November 2017 | 83.87 |
| December 2017 | 81.23 |
| January 2018 | 90.34 |
| February 2018 | 85.41 |
| March 2018 | 81.41 |
| April 2018 | 78.22 |
| May 2018 | 84.76 |
| June 2018 | 84.98 |
| July 2018 | 80.44 |
| August 2018 | 89.14 |
| September 2018 | 91.15 |
| October 2018 | 93.66 |
| November 2018 | 96.70 |
| December 2018 | 89.97 |

110.    This was much higher than Relator had seen at any of the other skilled nursing facilities where she had worked during the course of her career.

111.    While high RU percentages are not conclusive proof of fraudulent therapy billing, percentages as consistently high as what Relator saw at her facility and at other Jaffe Group facilities are simply not consistent with ethical therapy practices based on the actual needs of the patients.

**B.    Defendants Deliberately Track Therapy Discharges in order to make up lost minutes in other therapy disciplines and keep the patient at the same RUG level.**

112.    Pressuring therapists and therapy directors to treat to the RUG level, rather than based on individual patient need, would have been bad enough.  However, Relator discovered that Defendants' fraud was explicit and more deliberate than that.

113.    Specifically, Defendants manipulated therapy minutes between the three therapy disciplines in order to keep patients right at, or just slightly above, the 720-minute mark, even after being discharged from one of the therapy disciplines.

114.    During the normal course of a therapy patient's treatment, the patient is often discharged from one therapy discipline before another.  For example, a patient may reach all of his long-term goals for physical therapy, while still needing additional days of occupational and speech-language therapy.

115.    In these circumstances, the patient's total minutes of therapy should generally drop after he or she is discharged from a therapy discipline.  After all, if a patient receives 720 total minutes of therapy during one assessment period with three therapy disciplines treating, one would not expect the same number of therapy minutes during the next assessment period when only two disciplines are treating.

116.    However, at Regents Park of Jacksonville, this common-sense rule simply did not apply.  As Relator saw in record after record, the normal pattern at her facility was for treatment minutes to ramp up in the remaining disciplines once a patient was discharged from physical therapy, occupational therapy, or speech therapy.

117.    For example, **Patient G**, a Medicare Part A beneficiary, was admitted to the facility in or around the beginning of October 2016.[2]  During his first two assessment periods, **Patient G** received skilled therapy from all three therapy disciplines.  During his second assessment period— corresponding to his 14-day assessment on or about October 12, 2016—**Patient G** received 295 minutes of physical therapy, 315 minutes of occupational therapy, and 110 minutes of speech therapy—for a total of exactly 720 minutes.

118.    Speech therapy discharged **Patient G** at about the same time as he received his 14-day assessment—on October 11, 2016.  That meant that for his next assessment period—i.e. for his 30-day assessment held on or about October 26, 2016—he was only receiving therapy from two therapy disciplines, physical therapy and occupational therapy.  Despite that fact, **Patient G** once again received exactly 720 minutes of total therapy for the assessment period.  He received 350 minutes of physical therapy—55 minutes more than in the previous assessment period—and 370 minutes of occupational therapy—which was also 55 minutes more than he had received in the previous assessment period.  This was not a coincidence.

119.    Another, similar example, is **Patient H**, a Medicare beneficiary who was admitted to Regents Park of Jacksonville in October of 2018.  For most of the time that **Patient H** was a

---

[2]    To avoid any confusion, Relator is identifying patients by the same letter in this Amended Complaint as she used in her initial *qui tam* complaint, rather than re-lettering to reflect that certain specific patients from the initial qui tam complaint are no longer referenced in this amended complaint.  This amended complaint also refers to two additional, specific patients–Patients **X and Y**—who were not specifically referenced in the original *qui tam* complaint.

Part A beneficiary, he received therapy from all three therapy disciplines, and he always hit an RU RUG level. For example, during his 14-day assessment period, which had an ARD date on or about November 21, 2018, **Patient H** received 350 minutes of physical therapy, 152 minutes of occupational therapy, and 219 minutes of speech therapy—a total of 721 minutes.

120. However, the very next day, on or about November 22, 2018, **Patient H** was discharged from occupational therapy. During **Patient H**'s next assessment period—his 30-day assessment, which had an ARD date on or about December 11, 2018—**Patient H** still hit an RU RUG level—with 728 total minutes of therapy. During that period, **Patient H** received 429 minutes of physical therapy—79 minutes more than during the previous assessment period—and 299 minutes of speech therapy—80 minutes more than during the previous assessment period.

121. Another example of Defendants raising minutes to make up for a patient's discharge from a therapy discipline is **Patient I**. **Patient I** was a Medicare Part A beneficiary who began his Part A therapy at the facility in or around June of 2017.

122. During his first two assessment periods—for his 5-day assessment on or about June 6, 2017 and his 14-day assessment on or about June 13, 2017—**Patient I** received therapy from all three therapy disciplines. During the first assessment period, he received 265 minutes of physical therapy, 285 minutes of occupational therapy, and 171 minutes of speech therapy—for a total of 721 minutes. During his second assessment period, he received 310 minutes of physical therapy, 275 minutes of occupational therapy, and 150 minutes of speech therapy, for a total of 735 minutes.

123. On or about June 13, 2017, prior to **Patient I's** 30-day assessment, **Patient I** was discharged from speech therapy. Yet, during his 30-day assessment period, **Patient I** still hit an

RU RUG level—with 355 minutes of physical therapy and 365 minutes of occupational therapy, for a total of exactly 720 minutes.

124.    In addition to increasing minutes to make up for a therapy discharge, Defendants also regularly *reduced* minutes from existing disciplines when a patient began treatment with a new therapy discipline—in order to keep the total minutes from going too far above 720. Providing much more than 720 minutes of therapy in an assessment period was a bad investment for Defendants—and particularly for Select—as Defendants received no additional compensation for performing more than 720 minutes of therapy in an assessment period.

125.    One such example of Defendants cutting minutes from existing disciplines once a new discipline was added was **Patient J**. **Patient J** was a Medicare Part A beneficiary who began Part A therapy at Regents Park in November of 2016. During her initial assessment period, which had an ARD date at or around November 11, 2016, **Patient J** received physical therapy and occupational therapy, but no speech therapy. During that assessment period, **Patient J** received 331 minutes of physical therapy and 395 minutes of occupational therapy—for a total of 726 minutes and an Ultra High RUG score.

126.    During the next assessment period, **Patient J** was picked up on the speech therapy caseload and received 146 minutes of speech therapy during that assessment period. In order to avoid dramatically overshooting the 720-minute Ultra High threshold, **Patient J**'s occupational therapy minutes were reduced to 250—**145 minutes less** than she had received during the previous assessment period. The total number of physical therapy minutes remained about the same at 335. Accordingly, even after the addition of a new therapy discipline, **Patient J** received a total of only 731 minutes, just 11 minutes over the RU RUG threshold, and just five minutes more than she had received in the previous assessment period.

127.    An example of a patient whose therapy minutes were both increased and reduced in order to hit Defendants' preferred RUG targets was **Patient K,** a Medicare Part A beneficiary who began her Part A therapy at the facility in February of 2018.

128.    During her initial, 5-day assessment period, **Patient K** received exactly 720 minutes of therapy: 300 minutes of physical therapy, 330 minutes of occupational therapy, and 90 minutes of speech therapy.    Then, for whatever reason, **Patient K** received significantly less occupational therapy during her second, 14-day assessment period: 240 minutes—*i.e.* 90 minutes less than she had received during the prior assessment period.    However, during this same assessment period, **Patient K** received thirty more minutes of physical therapy—330—and sixty more minutes of speech therapy—150—which perfectly made up for the 90 minute shortfall in occupational therapy.    That allowed **Patient K** to exactly hit the 720-minute RU RUG threshold again.

129.    Then, before **Patient K**'s 30-day assessment period began, speech therapy discharged her.    However, her minutes of physical therapy and occupational therapy both increased—to 350 and 370, respectively—and **Patient K** again hit the ***exact*** number of minutes she needed to qualify for the Ultra High RUG score, at 720 minutes.

130.    While these specific examples are all from Relator's Regents Park of Jacksonville facility, the problem of manipulating therapy minutes to keep patients at an Ultra High RUG level extended far more broadly.

131.    During at least some of the period that Select served as the contract therapy provider for the Jaffe Defendants, Select's regional managers actively monitored patient therapy records across their different facilities for examples of patients who stayed at an Ultra High RUG level after being discharged from a therapy discipline.

132.    Select's regional managers appear to have been aware that the widespread practice of ramping up minutes in the remaining disciplines to make up for a therapy discharge in another discipline undermined any claim that Select was setting therapy minutes based on what was reasonable and necessary for the patients.

133.    However, rather than instructing program managers to review and perhaps lower the total therapy minutes for at least some of these patients, Select instead instructed the program managers to have their therapists file "addendum notes" for this additional therapy, to try to make these increases in minutes appear medically necessary and unrelated to either Select or any Jaffe Group entity's desire to maintain the Ultra High RUG level.

134.    Relator is specifically aware of an "Ultra Level Continuation Minute Check for Sep. 30, 2018" that a Select Regional Manager named Arnie Kruisland circulated to various program managers on October 18, 2018.

135.    In the cover email to that report, Regional Manager Kruisland stated to the program managers, "Please see attached for the Ultra Minute analysis workbook for September.  **Please review and scrub this report to verify we have notes where needed when one discipline DCs [discharges] and the other 2 maintain the current RUG.**  If note is not present, please have addendum note completed" (Emphasis Added). The report that Mr. Kruisland attached to that email identified 59 patients at 27 different Jaffe Group facilities from that month who met the criteria of maintaining the current RUG after discharge from one therapy discipline.

136.    For example, **Patient X**, a Part A beneficiary at the Winkler Court facility in Ft. Myers, Florida, appeared in Regional Manager Kruisland's report as having been discharged from speech therapy on September 26, 2018. **Patient X** nonetheless remained at an Ultra High RUG

level through the end September 2018, due to physical therapy and occupational therapy minutes being increased.

137.     Likewise, **Patient Y**, also a Part A beneficiary at the Winkler Court facility in Ft. Myers, Florida, appeared in Regional Manager Kruisland's report as having been discharged from speech therapy on September 4, 2018.  **Patient Y** nonetheless remained at an Ultra High RUG level through the end September 2018 due to physical therapy and occupational therapy minutes being increased.

138.     Notably, Regional Manager Kruisland never raised the possibility that program managers have their therapists determine whether it was appropriate to keep these patients at an Ultra High level in the first place.  His concern was simply to provide cover in case Select or any Jaffe Group entities were audited on these patients, in order to hide the reality that Defendants were keeping these patients at an Ultra High RUG level for reasons that had everything to do with profit, and nothing to do with actual patient need.

139.     This is consistent with other communications that Relator has seen—which reflect a conscious desire by both Select and the Jaffe Group defendants to paper over and conceal their fraudulent conduct as much as possible.

140.     For example, in November of 2018, then-Program Manager Kim Duguid was helping out at another Select/Jaffe Group facility that was between program managers—Orlando Health and Rehabilitation.

141.     On November 6, 2018, Ms. Duguid received an email from a therapist at the facility stating that their skilled nursing facility group "does dnot [sic] want us to schedule our patients at the rug level."  The email continued, "**per Arnie went [sic] need to schedule at 730 or 735**."  The "Arnie" in question was regional manager Arnie Kruisland.

142.    This email is notable in that it acknowledges that at least one of Select's regional managers was instructing program managers in his region to set patients at an arbitrary Ultra High minutes level.  Mr. Kruisland and his Jaffe Group counterparts likely recognized that having too many patients set at exactly 720 minutes per assessment period would be hard to justify and would be a red flag for fraud.  The email is also notable in that it specifically states that the facility managers—i.e. the Jaffe Group entities—were coordinating with Select about the scheduling of treatment, even though determinations as to how much therapy to provide to any specific patient should have been made by the patient's evaluating therapists, not by the facility owners.

143.    Picking an equally arbitrary target just 10-15 minutes above the Ultra High RUG threshold is no more reasonable or necessary for Defendants' patients then setting those patients at exactly 720 minutes.

144.    It is particularly unreasonable—and in fact plainly fraudulent—to arbitrarily shift minutes from one discipline to another to keep patients at these artificially inflated benchmarks even after their discharge from one of their therapy disciplines.  But this is precisely what Defendants have done.

C.  **Defendants Turn a Blind Eye to Therapists Falsifying Treatment Minutes in Order to Hit Ultra High RUG Targets.**

145.    Even with the rampant manipulation of minutes that went on at the Jaffe Group facilities where Select served as therapy contractor, it was not always possible to provide enough minutes to hit the Ultra High RUG level during an assessment period.  A patient might refuse treatment or be too sick to participate, leaving a discrepancy between the  number of minutes scheduled and the actual number of minutes.

146.    If that discrepancy arose early enough in a patient's assessment period, the facility could just make up the lost minutes by rescheduling the patient for more minutes on a later date.

However, if the shortfall happened on or right before the ARD date, the facility may not have had
time to just make up the minutes.

147.    This created incredible pressure on program managers and treating therapists, as
the regional managers for both Select and the Jaffe Group defendants have kept a close watch on
the progress of Part A patients to make sure that all patients scheduled for an Ultra High level
actually hit an Ultra High level.

148.    For therapists or program managers willing to violate their legal and ethical
obligations, one solution to this problem was to record treatment notes for minutes of therapy that
the therapist never provided.

149.    At her own Regents Park of Jacksonville facility, Relator is aware of at least one
therapist—a physical therapist named Lisa Leech—who engaged in this practice.

150.    From conversations Relator had with other therapists at her facility, it was common
for therapist Leech to "remember" therapy treatments that she claimed to have provided but not
yet recorded for a patient on or around that patient's ARD date, and which pushed a patient into
the Ultra High RUG category when the patient would otherwise have fallen just a few minutes
short.

151.    For example, in October of 2016, **Patient L,** a Part A beneficiary, had an ARD date
set for her 30-day assessment period on October 31.  While **Patient L** was scheduled for an Ultra
High RUG level that assessment period, it appeared, for whatever reason, that her minutes of
therapy were going to fall just short of the 720-minute threshold.

152.    Then, at 8:58 pm, October 31, therapist Leech entered a "change note" in the
system. In this note, therapist Leech claimed that she had performed 15 minutes of therapeutic
activities (CPT code 97530) as part of a joint treatment session with a physical therapy assistant

who had already recorded her own note for the patient.  As it happened, this extra 15 minutes pushed **Patient L** from 711 minutes to 726 minutes for the assessment period—enough to hit an Ultra High RUG level.

153.    Therapist Leech entered a similar change note in April of 2018.  In that instance, **Patient M**, a Medicare Part A beneficiary, was scheduled for his 5-day ARD on April 4, 2018, and it appeared that he was going to fall just a few minutes short of hitting the 720-minute threshold.

154.    Once again, Therapist Leech went in at the end of the day on the ARD date, and entered a change note, this time claiming to have performed 19 minutes of therapeutic activities (CPT code 97530) as part of a joint treatment session with a physical therapy assistant who had already recorded his own treatment note for the patient.  This 19 minutes of purported treatment was enough to push **Patient M** to 721 minutes of total therapy for the assessment period, just enough to hit the Ultra High minute threshold.

155.    In April of 2018, Therapist Leech also entered a suspicious change note for **Patient N**, a Medicare Part A beneficiary who had a 14-day ARD date set for April 19.  At the end of that day, therapist Leech again entered a change note in the system, claiming to have performed 25 minutes of gait training (CPT code 97116) as part of a joint treatment session with another physical therapist who had already recorded her own treatment note for the patient.  This 25 minutes of purported treatment was enough to push **Patient N** to 731 minutes of total therapy for the assessment period, enough to hit the Ultra High minute threshold.

156.    Looking over treatment records, Relator found dozens of similar examples of therapist Leech entering suspicious, last minute change notes that allowed a patient to hit the RU threshold where they would otherwise have fallen just a few minutes short.  In the vast majority

of these examples, therapist Leech would claim that she had been treating together with another therapist, and she would usually put her minutes under the "therapeutic activities" CPT code (97530), which is something of a catch-all code for physical therapists and does not correspond to any specific activity.  Relator asked some of the therapists that Ms. Leech claimed to have treated with, and those therapists confirmed that she had not actually treated with them.

157.    In some other instances, there was no obvious, existing treatment session for therapist Leech to piggyback on, and she would add her own, stand-alone treatment note for a patient.  But these notes were every bit as troublesome.

158.    For example, **Patient O**, a Part A beneficiary at the facility, was scheduled for her initial 5-day assessment on March 1, 2018.  At 8:56 a.m. the next morning, therapist Leech entered a treatment note claiming to have performed 10 minutes of therapeutic activities (CPT Code 97530) with **Patient O** the day before.  That 10 minutes was enough to push **Patient O** to 725 minutes of total therapy and an Ultra High RUG score for the assessment period.

159.    Notably, Relator saw no record of Patient Leech ever providing any other therapy to **Patient O**, other than this one, purported 10-minute session on the last day of her assessment period, which was not recorded in the system until 8:56 the next morning.

160.    From conversations with other therapists, Relator's understanding is that Kim Duguid, the Program Manager at Regents Park of Jacksonville prior to Relator, was at least generally aware of what therapist Leech was doing and tacitly approved of it—even when other therapists raised concerns to her.

161.    Eventually, in late 2018, another therapist at the facility called Select's corporate compliance hotline to report therapist Leech's fraudulent therapy practices.  This call eventually

led to Select terminating both therapist Leech and Program Manager Duguid, sometime in early 2019.

162.    From Relator's perspective, these terminations were simply the result of Select facing overwhelming evidence of fraud it was unable to ignore. And Relator is unaware of any efforts to repay any funds to the government related to the actions of Leech.

163.    More importantly, when Relator replaced Kim Duguid as Program Manager, Defendants made it abundantly clear that they expected her facility to maintain a high percentage of Ultra High Part A patients regardless of the actual therapeutic realities of the patient base. In short, the termination of Leech and Duguid was merely expedient window dressing.  The expectation that the program manager and facility therapists put profits above all else remained fully intact.

### D.    Defendants Provide Excessive Amounts of Part B Therapy to Patients Simply to Increase Their Reimbursement from Medicare.

164.    As previously noted, Regents Park of Jacksonville is licensed as a 120-bed nursing facility.

165.    Of those 120 beds, only about 30 are filled with Part A rehabilitation patients at any given time.  The remainder of the facility's patients are mostly long-term-care nursing patients, most of whom have their care covered by Florida Medicaid.

166.    While Medicare will not pay for skilled therapy for these patients under a PPS per diem as it does for Part A patients, Medicare will still cover medically necessary physical, occupational, and speech therapy for these patients, so long as they have insurance coverage under Medicare Part B.

167.    Under Medicare Part B, therapy is billed based on "units," the majority of which are measured in time-based increments of 15-minutes.

168.    As with skilled therapy under Medicare Part A, Medicare will only cover skilled physical, occupational, or speech therapy under Part B when that therapy is based on the beneficiary's actual "need for skilled care."  MEDICARE BENEFIT POLICY MANUAL ch. 8 § 30.4.

169.    Defendants blatantly violated this basic rule.

170.    Determining how much skilled therapy a particular patient needs is a clinical decision.  At least it is supposed to be.

171.    Relator was therefore shocked when she discovered that her Regional Manager, Megan Kealy, sometimes "remoted in" to the electronic records system for her facility to increase the projected treatment minutes for Part B patients.  Regional Manager Kealy made these changes without checking in advance with either Relator or the patient's treating therapists.

172.    For example, on April 2 and again on April 5, 2019, Regional Manager Kealy remoted into the electronic patient records system for the facility and increased the scheduled treatment minutes for seven different Part B therapy patients.

173.    On April 5, Regional Manager Kealy increased the physical therapy minutes for **Patient R** from 55 to 70 per day, five times per week, for the week of April 8, 2019.

174.    On April 5, Regional Manager Kealy also increased the physical therapy minutes for **Patient I** from 55 to 70 per day, five times per week, for the week of April 8, 2019.

175.    On April 5, Regional Manager Kealy also increased the physical therapy minutes for **Patient S** from 55 to 70 per day, five times per week, for the week of April 8, 2019.

176.    On April 5, Regional Manager Kealy also increased the physical therapy minutes for **Patient T** from 55 to 70 per day, three days per week, for the week of April 8, 2019.

177.    On April 5, Regional Manager Kealy also increased the minutes for both physical therapy and occupational therapy for **Patient U** from 55 to 70 minutes per day, five days per week, for the week of April 8, 2019.

178.    On April 2, Regional Manager Kealy increased the occupational therapy minutes for **Patient V** from 55 to 70 minutes per day, five days per week, for the period of April 3 through April 12, 2019.

179.    On April 2, Regional Manager Kealy increased the occupational therapy minutes for **Patient W** from 55 to 70 per day, five-days per week, for April 3 to April 5, 2019.  Then on April 5, Regional Manager Kealy again increased the daily, five-times per week occupational therapy minutes for **Patient W** from 55 to 70 for the week of April 8, 2019.

180.    Under the Medicare Part B billing rules, 55 minutes of therapy translates to 4 billable units of therapy (for most CPT codes), while 70 minutes of therapy translates to 5 units. As a result, Regional Manager Kealy's changes resulted in an extra billable therapy unit per patient per treatment day for each of these seven patients.

181.    Regional Manager Kealy's background was as a speech therapist.  Even if she had personally evaluated any of these seven patients—which she did not—it would not have been appropriate for her, on her own, to assess the physical or occupational therapy needs for any of these seven patients or to unilaterally increase their therapy minutes.

182.    Relator quickly discovered the changes Regional Manager Kealy had made, as the therapy management system at the facility tracked who the last individual was who had updated a particular patient's therapy schedule.

183.    When Relator called Regional Manager Kealy to express her surprise and concern about these changes, Regional Manager Kealy told her not to worry.  Specifically, she told Relator

that these increases would help the facility's numbers, that there was not much difference between 55 minutes and 70 minutes anyway, and that therapists will perform however much therapy you instruct them to perform.

184.    Relator was shocked by this blunt response and by her regional manager's willingness to change therapy minutes for reasons having nothing to do with the needs of the patient.

185.    Moreover, this incident with Regional Manager Kealy—though particularly egregious—was consistent with the pressure that Defendants put on therapists to keep Part B revenue flowing.

186.    Throughout 2018—and likely much earlier—Regional Manager Kealy regularly emailed then-Program Manger Kim Duguid with "Part B Minute Analysis" reports for the facility.

187.    These reports showed the number of Part B therapy units that Select had "missed" billing because therapists fell just a few minutes short of the threshold for the next billable therapy unit.

188.    For example, a report run on June 8, 2018, showed 19 examples of therapists who fell 1-5 minutes short of being able to bill for an additional unit of therapy.

189.    In the email forwarding this Report to Program Manager Duguid, Regional Manager Kealy wrote "Huge area of education."

190.    When Relator began working as Program Manager at the facility, Regional Manager Kealy started sending the same reports to her—and also emphasized that she needed to "educate" her therapists on how they were treating and billing.

191.    The clear purpose of these reports was to put pressure on therapists to treat and record their therapy minutes to maximize the number of units Select was paid, regardless of the actual benefit to the patient.

192.    Like the push to hit arbitrary Part A RUG thresholds, this push to maximize reimbursable units was an effort by Select—with the full encouragement of the Jaffe Group Defendants—to force therapists to make decisions about the amount of therapy to provide based on the financial interests of Defendants, rather than the best interests of the patients.

## D. DEFENDANTS' FRAUDULENT CONDUCT HAS RESULTED IN THE SUBMISSION OF MATERIALLY FALSE CLAIMS

193.    The claims that Select and the Jaffe Group Defendants submitted or caused to be submitted through the three schemes outline above were not only false, but materially false.  That is, if the United States had been aware of the fraudulent conduct at issue, it would not have paid the claims.

194.    Under CMS claims processing rules, institutional providers such as skilled nursing facilities submit claims for payment using form CMS-1450 (also known as a form UB-04), or its electronic equivalent.  The American National Standards Institute (ANSI) Accredited Standards Committee (ASC) X12N 8371 (Institutional) Version 5010A2 is the current electronic version of the CMS-1450.

195.    Each CMS-1450/UB-04 Form contains a statement that "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate, and complete.  That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

196.    Similarly, providers who sign up for CMS's Electronic Data Interchange Services—which is a pre-requisite for the electronic submission of claim forms—must expressly

agree that "it will submit claims that are accurate, complete, and truthful," and must further agree and acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

197.    Because of Defendants' fraudulent schemes, Defendants submitted and caused to be submitted have submitted false and  fraudulent claims for payment.  With respect to claims for Part A patients, Defendants submitted  or caused the submission of UB-1450 forms, or the electronic equivalent, that listed fraudulently inflated RUG levels.

198.    Based on billing and payment data provided to Relator by the United States under the Privacy Act Protective Order entered by this Court (ECF. No. 63) and for the express purpose of satisfying the heightened pleading requirements for *qui tam* actions under FRCP 9(b), Relator knows that these fraudulent schemes have in fact resulted in the submission of fraudulent claims, which were ultimately paid by the United States.

199.    For example, based on the records provided by the United States, for the month of October, 2016, the Jaffe Group entities owning and operating Regents Park of Jacksonville—specifically including defendants Epona Health Services and the Institute for Senior Living of Florida—billed or caused the United States to be billed $15,817.68 for the Part A skilled nursing care it provided to **Patient G** during that month.  After reviewing and making routine adjustments, the United States ultimately paid $12,459.45 for **Patient G**'s care for that month.[3]

---

[3]      These records have been provided to Relator pursuant to and subject to the requirements of the Privacy Act Protective Order entered in this action.  Upon the entry of an appropriate

200.     As set forth above at Section IB, Select, under pressure from the Jaffe Defendants
to keep patients at an Ultra High RUG level, falsely inflated the therapy minutes for **Patient G**
during this month by needlessly increasing scheduled physical and speech therapy minutes to
offset **Patient G**'s discharge from speech therapy and to ensure that the total number of therapy
minutes for the assessment period remained 720.

201.     As a result of this fraud, the United States paid for **Patient G**'s skilled nursing care
at an "Ultra High" rate for this period, despite the fact that **Patient G** only hit the "Ultra High"
threshold due to Defendants' fraud and minute manipulation.

202.     Similarly, and also based on the records provided by the United States, the Jaffe
Group entities owning and operating Regents Park of Jacksonville—specifically including
defendants Epona Health Services and the Institute for Senior Living of Florida—billed or caused
the United States to be billed $11,916.03 for the Part A skilled nursing services provided to **Patient
H** for the period of December 1, 2018 to December 25, 2018.  After reviewing and making routine
adjustments, the United States ultimately paid $9,622.27 for **Patient H**'s care for that month.

203.     As set forth above in Section IB, Select, under pressure from the Jaffe Group
Defendants to keep patients at an Ultra High RUG level, falsely inflated the therapy minutes for
**Patient H** during this month by needlessly increasing scheduled physical and speech therapy
minutes to offset **Patient H**'s discharge from speech therapy and to ensure that the total number
of therapy minutes for the assessment period remained above the Ultra High minute benchmark of
720.

---

protective order governing the use of documents by Defendants, Relator will produce the billing
data that was provided to Relator by the Government.

204.     As a result of this fraud, the United States paid for **Patient H**'s skilled nursing care at an "Ultra High" rate for this period, despite the fact that **Patient H** only hit the "Ultra High" threshold due to Defendants' fraud and minute manipulation.

205.     In or about March of 2018, the Jaffe Group entities owning and operating Regents Park of Jacksonville—specifically including defendants Epona Health Services and the Institute for Senior Living of Florida—billed or caused the United States to be billed $7,132.68 for the Part A skilled nursing services provided to **Patient K** the period of March 1, 2018 to March 16, 2018. After reviewing and making routine adjustments, the United States ultimately paid $5,984.39 for **Patient K**'s care for that period.

206.     As set forth above in Section IB, Select, under pressure from the Jaffe Defendants to keep patients at an Ultra High RUG level, falsely inflated the therapy minutes for **Patient K** during this period by needlessly increasing scheduled physical and occupational therapy minutes to offset **Patient K**'s discharge from speech therapy and to ensure that the total number of therapy minutes for the assessment period hit the Ultra High minute benchmark of 720.

207.     As a result of this fraud the United States paid for **Patient K**'s skilled nursing care at an "Ultra High" rate for this period, despite the fact that **Patient K** only hit the "Ultra High" threshold due to Defendants' fraud and minute manipulation.

208.     Therapist Lisa Leech's fabrication of therapy minutes for Part A patients —set forth in Section I(C) above—has also resulted in submission of false claims for payment and inflated payments by the United States.

209.     To give just one example, therapist Leech entered a "change note" at 8:58 pm on October 31, 2016, to falsely record 15 minutes of "therapeutic activities" (CPT code 97530) that she claimed to have performed with **Patient L.**  October 31, 2016 was the last day of **Patient L's**

30-day assessment period, and without this 15-minutes of recorded treatment, **Patient L** would have had a total of 711 therapy minutes for the period—9 minutes short of the Ultra High RUG threshold.

210.    Using these fabricated treatment records, Jaffe Group entities owning and operating Regents Park of Jacksonville—specifically including defendants Epona Health Services and the Institute for Senior Living of Florida—billed or caused the United States to be billed $15,863.08 for the Part A skilled nursing services provided to Patient L for the period of October 3, 2016 to October 31, 2016.  After reviewing and making routine adjustments, the United States ultimately paid $14,254.38 for **Patient L**'s care for that period.

211.    In short, the United States paid for **Patient L**'s skilled nursing care at an "Ultra High" rate for this period, despite the fact that **Patient L** only hit the "Ultra High" threshold due to the falsification of treatment minutes.

212.    With respect to claims for Part B patients, Defendants submitted or caused the submission of claim forms for Part B therapy provided to patients in amounts that Defendants knew to exceed any legitimate need for therapy services.

213.    For example, according to records provided by the United States, for the month of April, 2019, Defendant Select billed the United States $3,580.08 for therapy services provided to **Patient I**, ultimately being approved for reimbursement and paid $2,225.45 for those services. **Patient I**, as noted above, was a Part B Medicare beneficiary at this time, and on April 5, 2019 Regional Manager Kealy increased the physical therapy minutes for **Patient I** from 55 to 70 per day, five times per week, for the week of April 8, 2019.

214.    For **Patient V**, Defendant Select billed the United States $2,327.66 for therapy services for the period of April 1, 2019 to April 22, 2019, ultimately being approved for

reimbursement and paid $1,490.37 for those services.  **Patient V**, as noted above, was a Part B

Medicare beneficiary at this time, and on April 2, 2019 Regional Manager Kealy increased the

physical therapy minutes for **Patient V** from 55 to 70 per day, five times per week, for the period

of April 3, 2019 through April 12, 2019.

215.    As outlined above, the claims that Defendants have submitted for both Part A and

Part B rehab therapy are not merely false, they are materially false, meaning that the United States

would not have paid the claims at issue if it knew of Defendants' fraudulent schemes.

216.    With respect to therapy claims under Medicare Part B, a basic, fundamental rule is

that Medicare will not pay for any expense that is "not reasonable and necessary for the diagnosis

and treatment of illness or injury or to improve the functioning of a malformed body member." 42

U.S.C. §1395y(a)(1)(A).

217.    As detailed above, Defendants have knowingly and deliberately provided therapy

to Part B patients who had no medical need for the amount of therapy being provided.  Had the

United States known that there was no medical justification for this amount of therapy, and that it

was in fact being arbitrarily increased by a Select regional manager with no contact with the

patients themselves, the United States would not have paid for the units of therapy provided.

218.    Likewise, with respect to claims under Medicare Part A, CMS has repeatedly

emphasized that "services provided to a SNF resident must be 'reasonable and necessary for the

treatment of a patient's illness or injury, that is, are consistent with the nature and severity of the

individual's illness or injury, the individual's particular medical needs, and accepted standards of

medical practice." 79 Fed. Reg. 45628, 45651 (Aug. 5, 2014) (quoting Chapter 8, Section 30 of

the Medicare Benefit Policy Manual (Pub. 100-02).

219.    CMS has further emphasized that "the minimum therapy minute thresholds for each therapy RUG category *are certainly not intended as ceilings or targets for therapy provision*." 79 Fed. Reg. 45628, 45651 (Aug. 5, 2014) (emphasis added).

220.    Manipulating therapy minutes between disciplines to ensure the patient stays at the desired RUG level after being discharged from one therapy discipline, violates this clear CMS prohibition.

221.    Any reasonable person would have known that whether a claim for Part A skilled therapy is based on financially-driven, manipulated minutes is material to the United States' decision to pay the claim. Likewise, a reasonable person would know that whether a claim for Part B therapy minutes is based on therapy provided to an individual who had no clinical need for those therapy minutes is material to the United States' decision to pay the claim.

## CAUSES OF ACTION

## COUNT I

**Billing or Causing the Billing False and Fraudulent Claims to Medicare Part A and Medicare Part B in Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

**(asserted against Select Rehabilitation, LLC; Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC)**

222.    The federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A), creates liability for any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval to the United States.

223.    At all times relevant to this Complaint, the Defendants in this action have all either knowingly presented, or caused to be presented, or both, false and fraudulent claims for payment

for Medicare Part A patients receiving rehabilitative care at the 46 Jaffe Group skilled nursing facilities.

224. Defendant Select Rehabilitation, LLC, caused the submission of claims for inflated prospective per diem payments for Medicare Part A patients, based on Select Rehabilitation's practice of providing excessive and medically unnecessary therapy services simply to boost patient RUG rates and, by extension, their reimbursement levels.

225. The Jaffe Group Defendants—Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC —also all caused the submission of claims for inflated prospective per diem payments for Medicare Part A patients, by knowingly pressuring Select Rehabilitation and its skilled therapists to provide excessive and medically unnecessary therapy services

226. The Jaffe Group Defendants—Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC —as the entities and individual owning, controlling, and managing the 46 skilled facilities homes at issue, also submitted false claims for payment under Medicare Part A.  The Jaffe Group

Defendants knew that their claims for Medicare PPS payments for skilled nursing days were based in large part on excessive and unnecessary therapy minutes that would result in the Jaffe Group Defendants receiving higher PPS payments than they were lawfully entitled to receive from the United States.

227.    At all times relevant to this Complaint, the Defendants in this action all also knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States through the Medicare Part B Program, including claims for therapy provided to skilled nursing facility residents that was neither reasonable nor necessary for those residents.

228.    Defendant Select Rehabilitation scheduled and recorded treatment for these unreasonable Part B therapy minutes in order to maintain high revenue levels, without any regard for whether the therapy being provided to particular Part B patients was medically appropriate.

229.    The Jaffe Group Defendants—Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC —pressured Select rehab therapists to perform unnecessary Part B therapy in order to share in a portion of reimbursement from the United States and keep their own facility revenue up.

230.    By virtue of the false or fraudulent claims presented, or caused to be presented by Defendants, the United States has suffered damages.

231.    Defendants are all jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty for each false claim presented or caused to be presented by Defendants.

## COUNT II

**Billing Medicare for Services Not Rendered, in Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

**(asserted against Select Rehabilitation, LLC; Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC)**

232.    The federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A), creates liability for any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval to the United States.

233.    At all times relevant to this Complaint, all Defendants in this action knowingly presented, or caused to be presented, false and fraudulent claims for payment for Medicare Part A patients receiving rehabilitative care at the 46 Jaffe Group skilled nursing facilities.

234.    Defendant Select Rehabilitation knowingly caused the submission of inflated prospective per diem payment claims for Part A patients, based on Select Rehabilitation's practice of reporting more minutes of rehab therapy than Select Rehabilitation's therapists actually provided to patients.

235.    The Jaffe Group Defendants—Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health

– TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.;
Silver Lake Center, Inc., Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC
—pressured Select Rehabilitation's therapists to provide unreasonably high numbers of therapy
minutes and either know or acted in reckless disregard of the fact that the Select Rehabilitation
was reporting more minutes of rehab therapy than Select Rehabilitation's therapists actually
provided to patients.  The Jaffe Group Defendants then knowingly submitted falsely inflated
claims for Part A rehabilitative therapy payments to the United States, based on these over-reported
rehab therapy minutes.

236.    By virtue of these false and fraudulent claims presented, or caused to be presented
by Defendants, the United States has suffered damages.

237.    Defendants are jointly and severally liable to the United States for treble damages
under the FCA, in an amount to be determined at trial, plus a civil penalty for each false claim
presented or caused to be presented by Defendants.

## COUNT III

**Creation and Use of False and Fraudulent Documents**
**Material to the United States' Decisions to Pay Claims, in Violation of the**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

**(asserted against Select Rehabilitation, LLC; Anu Health Services, LLC; Aegir Health**
**Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health**
**Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.;**
**Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior**
**Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.;**
**The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., Howard Jaffe,**
**Airamid Florida LLC, and Airamid Health Services LLC)**

238.    The federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B), creates liability for any
person who knowingly makes, uses, or causes to be made or used, a false record or statement
material to a false or fraudulent claim.

239.    At all times relevant to this Complaint, Defendants have all knowingly used, or caused to be made or used, false records and statements material to their false and fraudulent claims for payment.

240.    Select Rehabilitation, LLC has made and created false therapy treatment records that overstate the number of reasonable, necessary, and compensable minutes of rehab therapy provided to a patient, and therapist treatment notes and evaluations stating that skilled therapy, or a particular amount of skilled therapy, was medically necessary in circumstances where it clearly was not.

241.    The Jaffe Group Defendants—Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., and Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC —have themselves all knowingly made and used false records material to their false and fraudulent claims.  These false records include the minimum data set reports that the Jaffe Group Defendants are required to create and submit for their Part A therapy patients each assessment period, and which specifically require the Jaffe Group Defendants to report on the number of compensable therapy minutes performed during an assessment period.

242.    The false and fraudulent representations contained within these documents were all material to the United States' decision to reimburse the skilled nursing facilities at particular per diem rates for particular Part A patients and for particular numbers of skilled therapy units for particular Part B patients.

243.    By virtue of the false and fraudulent records knowingly made, used, or caused to be made or used by Defendants, the United States has suffered damages.

244.    Defendants are joint and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty for each false claim presented or caused to be presented by Defendants.

## COUNT IV

**Retention and Concealment of Overpayments Made Under Medicare Parts A and B in Violation of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(G)**

**(asserted against Select Rehabilitation, LLC, Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC)**

245.    The federal False Claims Act creates liability for any person who knowingly conceals or knowingly and improperly avoids or decreased an obligation to pay or transmit money or property to the United States.

246.    The Jaffe Group Defendants—Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC —concealed or knowingly and improperly avoided their obligations to pay or transmit money to the United States by failing to repay amounts received from the United States for services that Defendants knew to have been medically unnecessary.

247.    The Jaffe Group Defendants all knew that that the United States had paid for therapy services under both Medicare Part A and B that Defendants knew were not medically reasonable.  The Jaffe Group Defendants also knew, or acted with reckless disregard for the fact, that the United States had paid for therapy services that had never actually been rendered.

248.    Select, for its part, actively assisted in concealing these obligations to repay by creating false and fraudulent therapy notes and other treatment records designed to cover up the fraud being committed and to make it appear that Defendants had a legitimate medical basis for the amounts of therapy being provided when they in fact did not.

249.    By virtue of Defendants' knowing concealment and avoidance of their obligations to pay money to the United States, the United States suffered damages.  Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty for each false claim presented or caused to be presented by Defendants.

## <u>COUNT V</u>

**Conspiracy to Violate the Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(C)**

**(asserted against Select Rehabilitation, LLC; Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc., Howard Jaffe, Airamid Florida LLC, and Airamid Health Services LLC)**

250.    The federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C) creates liability for any person who conspires to commit a violation of the federal False Claims Act.

251.    The Defendants in this case have all conspired to knowingly present false and fraudulent claims for payment to the United States.

252.    Defendant Howard Jaffe, as the President and ultimate decision-maker for each of the intermediary organizations that own and/or operate the 46 Jaffe Group skilled nursing facilities, knowingly directed those organizations to maximize Medicare reimbursement without regard for the individual rehabilitation needs of any of skilled nursing facility patients.

253.    Those intermediary organization Defendants—Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South – Ex, LLC; Senior Health – TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; and Silver Lake Center, Inc—have all owned and controlled specific Jaffe Group skilled nursing facilities and have worked with Select Rehabilitation and the health service organization Defendants to set arbitrary and medically unjustified therapy treatment goals for patients in order to maximize facility reimbursement from the United States.

254.    The health service organization Defendants— Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, Airamid Florida LLC, and Airamid Health Services LLC —have been responsible for managing the day-to-day operations of the Jaffe Group skilled nursing facilities, including their financial performance.  Managers and employees of these different health service organization Defendants have interacted regularly with Select Rehabilitation managers and employees—including Select regional managers and program managers—in order to pressure those Select Rehabilitation managers and employees to schedule and perform rehabilitation therapy based upon the financial goals of the Jaffe Group, rather than individual patient needs.

255.    Defendant Select Rehabilitation, LLC has acted as the contract provider of therapy at the 46 Jaffe Group facilities at issue in this Complaint.  Select Rehabilitation—acting through

its regional managers, as well as other managers and employees—has worked hand in hand with the Jaffe Group Defendants to schedule and perform and the submission of claims for grossly excessive amounts of rehabilitative therapy under Medicare Part A and Medicare Part B.

256.    These various Defendants have acted in concert with the specific goal of obtaining grossly inflated and unlawful compensation from the United States for therapy minutes that were excessive, medically unnecessary, and in some cases not performed at all.

257.    As a result of this conspiracy to submit false and fraudulent claims, the United States has suffered actual damages.

258.    Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty for each false claim presented or caused to be presented by Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator seeks the following relief:

A.    That the United States be awarded damages, assessed jointly and severally against all Defendants, in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as provided by the FCA, 31 U.S.C. §3729 *et seq*.

B.    That civil penalties be assessed against Defendants for every false claim submitted to the United States, to the maximum extent permitted by the FCA, 31 U.S.C. §3729 *et seq*.

C.    That Relator be awarded the maximum possible relator's share permitted by 31 U.S.C. § 3730(d) for any recovery by the United States;

D.    That Relator be awarded litigation costs, expenses, and attorneys' fees to be paid by Defendants to the fullest extent permitted under the law, including under 31 U.S.C. § 3730(d);

      E.      Such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Relator demands a jury as to all claims so triable.

DATED:  May 24, 2024           Respectfully Submitted,

                /s/ Jerry E. Martin
                JERRY E. MARTIN – Trial Counsel (TN Bar # 20193)
                SETH M. HYATT (TN Bar # 031171)
                BARRETT JOHNSTON MARTIN
                  & GARRISON, PLLC
                200 31st Ave. N
                Nashville, TN  37203
                Phone – (615) 244-2202
                Fax – (615) 252-3798
                jmartin@barrettjohnston.com
                shyatt@barrettjohnston.com

                ROBBINS GELLER RUDMAN
                & DOWD LLP
                MARK DEARMAN (FL Bar No. 982407)
                120 East Palmetto Park Road, Suite 500
                Boca Raton, FL 33432
                Phone – (561) 750-3000
                Fax – (561) 750-3364
                mdearman@rgrdlaw.com

## **CERTIFICATE OF SERVICE**

I certify that a true and exact copy of the foregoing *Amended Qui tam Complaint* has been

served on the following counsel via Court's CM/ECF email notification system, on this the 24th

day of May 2024.

Matthew Papkin
Morgan, Lewis, & Bockius, LLP
600 Brickell Avenue, Suite 1600
Miami, FL 33131
matthew.papkin@morganlewis.com

Kayla Stachniak Kaplan**
Kathleen McDermott**
Morgan, Lewis, & Bockius, LLP
1111 Pennsylvania Ave, NW
Washington, DC 20004
kayla.kaplan@morganlewis.com
kathleen.mcdermott@morganlewis.com

Meredith S. Auten**
Morgan, Lewis, & Bockius, LLP
2222 Market Street
Philadelphia, PA 19103
meredith.auten@morganlewis.com

*\*\*Admitted Pro-Hac Vice*
*Attorneys for Defendant Select Rehabilitation, LLC*

Giovanni Giarratana
Bradley Arant Boult Cummings LLP
1001 Water Street, Suite 1000
Tampa, FL 33602
ggiarratana@bradley.com

Jack Selden**
J. Bradley Robertson**
1819 5th Avenue North
Birmingham, AL 35203
jselden@bradley.com
brobertson@bradley.com

Lyndsay E. Medlin**
Jonathan H. Ferry**

214 N. Tryon Street, Suite 3700
Charlotte, NC 28202
lmedlin@bradley.com
jferry@bradley.com

*\*\*Admitted Pro-Hac Vice*
*Attorneys for Defendants: Anu Health Services, LLC; Aegir Health Services, LLC; Brigid Health Services, LLC; Epona Health Services, LLC; Kannon Health Services, LLC; Fortuna Health Services, LLC; Hearthstone Senior Communities, Inc.; Institute for Senior Living of Florida, Inc.; Orlando Rehabilitation Group, Inc.; Senior Health South-Ex, LLC; Senior Health-TNF, LLC; The Northeast Health Group, Inc.; The Rehabilitation Group of Pennsylvania, Inc.; Silver Lake Center, Inc.; and Howard Jaffe*

Civil Chief Randy Harwell
Assistant U.S. Attorney Robert D. Sowell
U.S. Attorney's Office
400 North Tampa Street
Suite 3200
Tampa, FL 33602
Randy.Harwell@usdoj.gov
Robert.Sowell@usdoj.gov

*Counsel for the United States*

                                        /s/ Jerry E. Martin
                                        Jerry E. Martin
                                        Barrett Johnston Martin
                                        & Garrison, PLLC